**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **DUANE KUIPERS and** ) | |
| **BRIAN KUIPERS,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | **Case No. 23 C 15115** |
| ) | |
| **DRAKE TOWER APARTMENTS, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Plaintiffs Duane and Brian Kuipers have sued their former employer, Drake Tower Apartments, under the Americans with Disabilities Act, 42 U.S.C. § 12112(b)(5)(A). They contend that Drake Tower discriminated against them on the basis of their disabilities because it refused to provide them an accommodation exempting them from the company's COVID-19 vaccination mandate and then terminated them. For the following reasons, the Court grants Drake Tower's motion for summary judgment.

**Background**

Duane and Brian Kuipers were long-time workers with Drake Tower, a high-rise apartment building on East Lake Shore Drive in Chicago. During the relevant period, Drake Tower had about seventy-five residents, about seventy-five percent of whom were age seventy-five or older.

Duane Kuipers began working for Drake Tower in 1983. He worked primarily as a maintenance worker and occasionally as a doorman and elevator operator in the

building. His son, Brian Kuipers, started working for Drake Tower in 2005; he worked as a doorman and elevator operator.

On October 14, 2021, Drake Tower informed employees that it planned to institute a COVID-19 vaccination mandate. It asked all employees to submit proof of vaccination by December 3, 2021. The notice also informed employees that they could apply for a pregnancy, disability, or religious exemption but that any employee approved for an exemption would have to undergo weekly COVID-19 testing.

In late November 2021, the Kuipers both applied for an exemption from the vaccination mandate based on a claimed medical disability. In preparing their requests, both individuals met with Edgar Elias Archbold, who at the time was a medical doctor.[1] Archbold provided both Kuipers with virtually identical exemption forms that attached virtually identical letters. Brian Kuipers's form and letter are reproduced below:

---

[1] Archbold no longer has a medical license. He let his license expire and did not seek renewal after pleading guilty earlier this year to a charge of criminal sexual assault against a minor patient. *See* Pl.'s Ex. 3 at 132:13-14, 142:1-3.

2

# REQUEST FOR MEDICAL EXEMPTION FROM COVID-19 VACCINATION

To be completed by requestor.

Name: Brian J Kuipers          Date of Birth: ████

Email: _____ Phone No.: _____

To be completed by the physician.

Physician Name: _Edgar  Archbold,_MD_____ Physician Phone No.: 630-896-4050__

Physician Address: _507 West Kendall Drive Suite 8 Yorkville, IL 60650_____

The above person should not be immunized for COVID-19 for the following reasons (Please fill out and check all that apply):

Contraindication for COVID-19 vaccination list all brands and contraindications:

Moderna, Pfizer, Astra-Zeneca, Johnson+Johnson_____

How long will the medical contraindication last? Permanent_____

___ Severe allergic reaction (e.g., anaphylaxis) after a previous dose or to a component of the COVID-19 vaccine.

___ Immediate allergic reaction of any severity to a previous dose or known (diagnosed) allergy to a component of the vaccine. (Vaccine Ingredients: https://www.cdc.gov/vaccines/covid-19/info-by-product/clinicalconsiderations.html#Appendix-C)

Which ingredient caused an allergic reaction? _____

What was the reaction? _____

✗ Other medical reason – Please Provide this information in a separate narrative that describes the other medical reason justifying an exemption in detail.

I certify that Brian J Kuipers  has the above contraindication or specific medical condition and request a medical exemption from COVID-19 vaccination.

Physician Signature: _E ᴄʟʟʙᴏ _____ Date: 11/23/21

3

# COVID 19 EXEMPTION MEDICAL REASON

Date – 11/23/2021

Name: Brian J Kuipers

1 - Suffers from multiple allergies for which he has been treated over the years for asthma.

2 - The COVID vaccines are a new experimental, and unproven vaccine that are causing MANY injuries and DEATHS.

3 - The COVID vaccines reports indicate that you CAN STILL CATCH COVID, and they CAN STILL GIVE IT TO OTHERS after you have been vaccinated.

4 - The COVID vaccines ingredients include:

Aborted fetal tissue - mRNA that damages the DNA of the ovaries and testicles, of the person receiving the "killshot". This product has been reported to cause sterility in 97% of males and 40% of females. In addition 99% of already pregnant women receiving the COVID vaccine have lost their babies (1,200 miscarriages reported), or end up with a "Hydra mutant baby" with DNA abnormalities.



SM 102 - a patented chemical substance containing the patented - Luciferase.

Graphene Dioxide - 95% of all vaccines have this component, which causes thrombogenicity, formation of a thrombi, a blood clott. This component also may destroy the immune system, causes bilateral pneumonia, as well as the loss of taste and smell.

5 - The verified reported adverse reactions of 25,000 vaccinated individuals in Israel include:

Problem with vision, allergic reactions, shingles, migraines & sleeping problems, muscle aches, swollen lymph nodes, skin inflammation, chest pains, heart problems, heart attacks, myocarditis, vaginal bleedings, menstrual disorders, miscarriages, fetal abnormalities, asthma, shortness of breath, reduced oxygen saturation, blood clots, facial nerve paralysis, strokes and deaths.

Because of all of the above, Brian J Kuipers is instructed to refuse the COVID vaccine experiment until they are effectively proven to be safe.

Edgar Archbold, MD.

**Edgar Archbold, M.D.**
507 West Kendall Drive
Suite 8
Yorkville, IL 60560

4

Significantly, nothing in Archbold's letter suggested that there was any particular reason related to the Kuipers' allergies and supposed asthma that made the COVID vaccine contraindicated for them. Rather, the letter is reasonably read to say that, according to Archbold, *no one* should get the COVID vaccine. Separately, the letter reads more like a polemic than a medical opinion, right down to its repeated use of all-capitals for emphasis and its use of the "Hydra mutant baby" picture, whose claimed association with the COVID vaccine is unsupported by Archbold or, for that matter, anyone else. Finally, and significantly for present purposes, Archbold's stated objection to the vaccine appeared to turn on his belief that it is not safe, period, not that it posed any particular problem associated with the Kuipers' claimed asthma or allergies: the letter closed with the statement: "Brian J Kuipers is instructed to refuse the COVID vaccine experiment until they [sic] are effectively proven to be safe." Def.'s Ex. 7 at 2.

After receiving the nearly-identical exemption requests, Drake Tower's counsel sent the Kuipers' counsel (the same attorney who represents them here) a letter dated December 16, 2021. *See* Defs.' Ex. 11. The letter stated that "the information provided by the Kuipers in support of their exemption requests under the vaccine requirement is insufficient. For example, there is no explanation as to why, in their cases, having asthma is a medical condition that requires such an exemption. Also, in your last email, you have now stated they have 'natural immunity' without sufficient explanation as to how they obtained such 'natural immunity' and why a basis for refusing to be vaccinated." *Id.* at 1. Drake Tower's attorney asked for further information "to assess the merits of the exemption request" and "to determine what, if any, accommodations would eliminate or greatly reduce the significant risk of substantial harm that they, as

5

unvaccinated individuals, present to themselves, their co-workers, and the residents of the building." *Id.* The letter further stated that in Drake Tower's view, the material submitted was "insufficient and questionable as to [its] veracity." Drake Tower's counsel noted that the exemption requests—from the Kuipers and one other person represented by the same counsel—were each "identical," came from a doctor located 60 miles from where the Kuipers lived who did not appear to be their regular physician, did "not actually say that your clients' reported medical conditions make it unsafe for them to receive the COVID-19 vaccine," and did "not identify any vaccine ingredients to which your clients are reportedly allergic." *Id.* at 3. The letter further stated that the requests' contentions were contrary to published findings of the Centers for Disease Controls and the Food and Drug Administration in various respects. *Id.* Drake Tower's counsel included a list of questions he had regarding these and other points arising from the exemption requests. *Id.* at 4.

Two days later, on December 16, 2021, Drake Tower's attorney sent the Kuipers an additional communication, via their attorney at Duane Kuipers's request. The letters again stated that "[m]ore information is needed from you and your doctor," and it enclosed a medical certification form for the Kuipers' doctor to complete, along with a HIPAA release to permit their doctor to speak with Drake Tower. *Id.* at 1, 2-5.

Both Kuipers met with a representative of Drake Tower on January 4, 2022 regarding their exemption requests and the question of accommodations. The Drake Tower representative's notes from the meeting have been provided to the Court. *See* Def.'s Ex. 13. Duane (the Court will use first names here for simplicity's sake) said he had been diagnosed with asthma around 2018 and had "concerns about asthma and

getting vaccinated." *Id.* at 1. Brian said he was diagnosed with asthma at age fourteen

(he was thirty-nine at the time of the meeting). *Id.* at 8. Both said they had not

previously seen Archbold (who was not their regular physician) and Duane said they

had heard about him from another Drake Tower employee—the third employee

represented by the Kuipers' counsel. *Id.* at 2, 7. The Kuipers stated that Archbold had

not performed any tests on them other than taking their blood pressure and measuring

their height and weight. *Id.* at 4, 7. They said they were provided the exemption forms

at the end of the visit. *Id.* at 4, 7. Drake Tower's representative asked whether Archbold

could complete the additional forms Drake Tower had sent and whether they would be

willing to get a medical opinion from a different doctor. On both, the Kuipers said they

would consider the requests; Drake Tower's representative asked them to do so as soon

as possible, "within the week." *Id.* at 5. Finally, the representative asked what

accommodations they would agree to as an alternative to getting vaccinated; they said

they would agree only to being tested for COVID once weekly. *Id.* at 6.

      In support of his claim of a disability, Brian Kuipers testified that he has been

diagnosed with asthma and routinely uses two types of inhalers to control his

symptoms. He stated that while working at Drake Tower, he was "careful not to strain

myself, because I would get out of breath, you know, it would make me tired, and if I

over did it, I could wind up in the hospital. . . ." and that especially when he lifted items,

he had to "pace [him]self . . . sometimes take small breaks." Pls.' Ex. 4 at 21:5-16.

      For his part, Duane Kuipers testified that he experienced thyroid dysfunction and

allergies. But when he was seen by Archbold, Archbold appears to have determined

that Duane had asthma because, purportedly, his self-medication with Albuterol and

family history of asthma were more indicative of an asthma diagnosis than allergies.

The Kuipers did not provide further information following their meeting with Drake Tower, nor had Drake Tower obtained by mid-January a response to its December 16 request for further information from Archbold. Accordingly, on January 24, 2022, Drake Tower sent letters to the Kuipers stating that it was terminating them in light of their failure to provide the requested additional medical information. *See* Def.'s Ex. 8. The letter stated that despite the termination, Drake Tower would give the Kuipers until January 29 to obtain the additional information, and if so, "Management will determine whether that information in any way affects the decision to terminate your employment." *Id.*

The Kuipers sent Drake Tower a response from Archbold on January 27. *See* Def.'s Ex. 16. Archbold contended that the COVID vaccine was unapproved, was experimental, and said that "graphene hydroxide," which he claimed the vaccine contained, causes blood clotting. Archbold's response did not provide any explanation for any contention that the COVID vaccine was contraindicated for persons with asthma or seasonal allergies.

The Kuipers have sued Drake Tower for discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12111. Specifically, they contend that Drake Tower failed to reasonably accommodate their claimed disabilities. *See* Compl. ¶¶ 46, 58; Pls.' Mem. in Opp. to Def.'s Mot. for Summ. J. at 10, 15.[2] Drake Tower has moved for summary

---

[2] Plaintiffs' complaint includes references to discrimination and retaliation, but in opposing summary judgment they argue the matter exclusively on the basis of failure to accommodate. They have therefore waived any claims other than that. *See Palmer v. Marion County*, 327 F.3d 588, 597 (7th Cir. 2003) ("[B]ecause Palmer failed to delineate his negligence claim in his district court brief in opposition to summary judgment or in

8

judgment.

**Discussion**

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The burden is on the moving party to demonstrate no genuine dispute of material fact exists.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In assessing a summary judgment motion, the Court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor.  *See Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018).  The Court cannot "make credibility determinations" or "weigh the evidence."  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  Still, to defeat summary judgment, the nonmoving party must identify "specific facts showing that there is a genuine issue for trial" that go beyond a "mere scintilla of evidence."  *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018).

**A.      Claims of failure to accommodate**

The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  "Discriminate" includes failure to make reasonable accommodations "to the known physical . . . limitations of an

---

his brief to this Court, his negligence claim is deemed abandoned."  Regardless, plaintiffs include no evidence—such as references to similarly situated persons who were treated differently—to support claims of discrimination.

otherwise qualified individual with a disability who is an . . . employee." *Id.* § 12112(b)(5)(A).   To prevail on a claim of failure to accommodate under the ADA, "a plaintiff must show that: (1) [he] is a "qualified individual with a disability; (2) the employer was aware of [his] disability; and (3) the employer failed to reasonably accommodate the disability." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005).  Drake Tower argues that the Kuipers' discrimination claims fail because neither of them were disabled within the meaning of the ADA.  It further argues that the Kuipers were not "qualified individuals" under the ADA because there was no reasonable accommodation vaccine that would have allowed them to perform the essential functions of their maintenance and elevator jobs.

### 1.    Disability

The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 438 (7th Cir. 2000) (citing 42 U.S.C. § 12102(2)). Drake Tower contends that neither of the Kuipers was disabled within this definition.  At the summary judgment stage, the Court's role is not to determine whether the Kuipers had a disability, but "whether a rational jury, viewing the evidence in the light most favorable to the plaintiffs, could come to such a decision." *Sears, Roebuck & Co.*, 233 F.3d at 438.

The first question is whether the Kuipers have identified a physical or mental impairment.  The EEOC has indicated that a physical impairment is "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more

body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine." *Richardson v. Chicago Transit Auth.*, 926 F.3d 881, 887 (7th Cir. 2019) (citing 29 C.F.R. § 1630.2(h)(1)) (internal quotation marks omitted).

Brian Kuipers contends that he is diagnosed with asthma; Duane Kuipers contends that he suffers from thyroid dysfunction and asthma. Asthma qualifies as a "physical impairment" given its impact on an individual's respiratory system. *See Bond v. Sheahan*, 152 F. Supp. 2d 1055, 1064 (N.D. Ill. 2001). Accordingly, the Court focuses on whether the Kuipers have identified evidence sufficient to permit a reasonable jury to find that they suffer from asthma.

Brian Kuipers contends that he has had asthma since he was a child and that he uses two types of inhalers to control his symptoms. *See* Pl.'s Ex. 4 at 31-35. Archbold testified that during Brian's visit, he checked Brian's oxygen levels and found them to be low. He also testified that he reviewed records indicating that Brian had a history of asthma. This is sufficient evidence to create a genuine factual dispute regarding whether Brian has asthma. Archbold also determined that Duane Kuipers experienced asthmatic symptoms and that he reacted positively to albuterol, which led him to determine that Duane had been misdiagnosed for allergies when he in fact had asthma. Based on this evidence, a reasonable jury could find that Duane also has asthma.

But the inquiry does not end there. An individual's claimed disability must also be shown to substantially limit one of his or her major life activities. *See Webb v. Clyde L. Choate Mental Health & Dev. Ctr.*, 230 F.3d 991, 997 (7th Cir. 2000). A disabled

individual is substantially limited in performing a major life activity when he, "compared to the general population, is unable to perform or is significantly restricted as to the condition, manner, or duration under which she can perform that major life activity." *Sears, Roebuck & Co.*, 233 F.3d at 438. Breathing, working, and walking count as major life activities. *See* 42 U.S.C. § 12102(2)(A).

Brian Kuipers contends that his asthma impacts his breathing, a major life activity. He testified that while working, he was "careful not to strain myself, because I would get out of breath, you know, it would make me tired, and if I over did it, I could wind up in the hospital. . . ." and that especially when he lifted items, he had to "pace [him]self . . . sometimes take small breaks." Pl.'s Ex. 4 at 21:5-16. This is sufficient to permit a reasonable jury to find that Brian's asthma amounts to a disability.

On the other hand, the plaintiffs do not even address this point with respect to Duane Kuipers, besides vaguely arguing that asthma impacted his ability to breathe. Duane has not pointed to any evidence—aside from his own general contention that asthma impacts his breathing and walking—regarding how and to what extent asthma impacted these activities. *See Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 784–85 (7th Cir. 2007) (finding that plaintiff had not shown her disability impacted sitting and walking because she had not identified any specific limits, such as time or distance that constrained her ability to walk). And there is no indication that Archbold testified that Duane's purported asthma impacted any major life activity. *See* Pl.'s Ex. 3 at 103. Archbold was asked only whether Duane's claimed hypothyroidism impacted his major life activities, and in response, he did not offer a direct or clear answer. Rather, when asked whether hypothyroidism's symptoms impacted Duane's ability to move or engage

12

in basic life activities, Archbold vaguely stated only that the symptoms "affect[ ] his disability." *Id.* In sum, there is essentially no evidence that Duane's purported asthma or any other medical condition substantially impacted any of his life activities (or, with regard to his claimed hypothyroidism, that he even had the condition). Without more, no reasonable jury could find that Duane was disabled within the meaning of the ADA. His claim therefore fails at the threshold.

The Court notes that even if Duane could establish that he had a disability, his claim would fail on the same basis as Brian's ADA claim, as further discussed below.

### 2.    Qualified individual

To sustain an ADA accommodation claim, besides establishing that they have a disability, a plaintiff must show that he is "qualified," or in other words, that he can perform, with or without reasonable accommodation, the essential functions of the job in question. *See Peters v. City of Mauston*, 311 F.3d 835, 842 (7th Cir. 2002). The Kuipers argue that Drake Tower should have accommodated their disabilities by allowing them to wear masks and partake in weekly COVID-19 testing instead of taking the vaccine.

In response, Drake Tower contends that the Kuipers were not qualified individuals because of the frequency with which their roles required them to interface with elder residents and the direct threat they would pose to these residents with their proposed accommodation. Drake Tower points out that both plaintiffs worked inside the apartment building, frequently were in small elevators with residents, and had to enter apartments to perform repair work in close proximity to elderly residents. For all these reasons, it argues that permitting the plaintiffs to remain unvaccinated during a global

13

pandemic would have posed a direct threat to the health of the building's residents and thus that the Kuipers were not qualified individuals with the accommodation they proposed.

The evidence supports Drake Tower's contention. On the record before the Court, no reasonable jury could find otherwise. See *Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 288 n.16 (1987) ("A person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk."); *see also Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 431 (D. Mass. 2021) ("Plaintiffs are not, however, qualified individuals if they pose a 'direct threat' to the health or safety of other individuals in the workplace.").

Drake Tower's expert, Dr. Ries, explained in detail in his expert witness disclosure that vaccination would ensure that COVID-19 would not spread as rapidly and would decrease the severity and contagiousness of an infection. He also highlighted that COVID-19 presents a particularly high risk for elderly individuals and that over seventy-five to eighty percent of Drake Tower's ninety-five residents were age seventy-five or older. This testimony is uncontradicted by any admissible evidence in the record. In such circumstances, as a company potentially liable for other individuals' health and safety, waiving the vaccination requirement for the Kuipers would have created a safety risk for other residents. No reasonable jury could find otherwise based on the record before the Court. For these reasons, the Kuipers are not "qualified individuals" either without or with their proposed accommodation. Their ADA claims fail on this basis.

14

The Kuipers' additional arguments do not change this conclusion. In arguing the effectiveness of their proposed accommodation, the Kuipers contend that Dr. Ries stated that "wearing a mask 'decreases the spread of COVID'" and that "[b]oth Dr. Ries and Dr. Archbold testified that the COVID-19 vaccine does not prevent an individual from getting infected with COVID." *See* Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. at 17. This is an incomplete representation of Dr. Ries's testimony on these points. Dr. Ries testified that *although* masks decrease the spread of the virus, it "depends on the type of mask[]." *See* Pl.'s Ex. 6 at 21:17-24. And he further testified that although "the vaccine is not 100 percent protective[,] [i]t significantly decreases [one's] chances of (a) getting COVID and (b) suffering some of the serious consequences of having a COVID infection," and it is the best way for an individual to protect himself from the most serious consequences of the disease. *Id.* at 14-15, 22. He further testified that vaccinations "do significantly decrease the spread of COVID, so your statement is not 100 percent correct. Is it 100 percent protective against spreading COVID? No. But it specifically--and literature will document that it decreases the spread of COVID in individuals who have COVID and were vaccinated with the COVID vaccine." *Id.* at 16:4-15. Further, in his expert witness disclosure, Dr. Ries stated that "[a] SARS-CoV-2 test does have false negative results and may take several days from onset of infection until the test turns positive. Therefore, weekly testing did not prevent an individual from being contagious even with a negative Covid-19 test." *See* Def.'s Ex 2 at 4. In other words, a masking-plus-testing accommodation for the Kuipers still would have left Drake Tower's largely elderly tenants at risk. Reviewing Dr. Ries' testimony in its entirety, therefore, does not undermine Drake Tower's argument that permitting the Kuipers to

15

remain unvaccinated and wear facemasks still would pose a significant risk to the building's elderly tenants.  Even the plaintiffs' primary medical witness, Archbold, testified that masks are not a foolproof solution.  When asked "would wearing a mask have provided better protection to the people around [the Kuipers] when they were infected with COVID over wearing no mask at all," Archbold stated that "[i]t would help not contaminating them, but the virus would still come through."  Pl.'s Ex. 3 at 101:10-17.  Thus, as the Court has concluded, no reasonable jury could find the Kuipers to be "qualified individuals" because they would have posed a direct threat to Drake Tower's elderly residents even with their proposed accommodation.

Additionally, the Kuipers also seem to suggest they were qualified individuals with their requested accommodation because Drake Tower permitted them to continue working with masks and weekly testing while this accommodation was being negotiated.  *See* Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. at 12; Pls.' Ex. 5 at 68:5-14; Pls.' Ex. 4 at 72:23–73:5.  But the fact that an employer has in the past provided an employee with a temporary accommodation "does not obligate [it] to continue providing such an accommodation."  *See Phelps v. Optima Health, Inc.*, 251 F.3d 21, 26 (1st Cir. 2001); *see also Tate v. Dart*, 51 F.4th 789, 800 (7th Cir. 2022) ("Second, just because the Sheriff has accommodated Tate as a sergeant does not mean that responding to violent emergencies is not an essential function of the position.  Tate's accommodation as a sergeant may very well go above and beyond what the ADA requires."); *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 545 (7th Cir. 1995) ("[I]f the employer . . . bends over backwards to accommodate a disabled worker—goes further than the law requires— . . . it must not be punished for its generosity by being deemed to have

16

conceded the reasonableness of so far-reaching an accommodation."); *Amadio v. Ford Motor Co.*, 238 F.3d 919, 929 (7th Cir. 2001). Therefore, this contention also has no bearing on the defendant's argument that the Kuipers were not qualified individuals.

Even if the Kuipers were able to establish that they were qualified individuals, the evidence shows, without any genuine factual dispute, that Drake Tower was still justified in rejecting masking-plus-testing as a reasonable accommodation for the same reasons as already discussed. *See Coggin v. Medline Indus., Inc.*, 749 F. Supp. 3d 960, 966 (N.D. Ill. 2024) (citing *EEOC v. United Airlines, Inc.*, 693 F.3d 760, 762-63 (7th Cir. 2012) (finding that an employer is permitted to deny an employee an accommodation if that accommodation creates an undue burden on the employer, such as exposing individuals to safety risks.).

In any case, there is a more basic problem with the plaintiffs' accommodation claims: they have offered no admissible evidence to support the proposition that their claimed disabilities (asthma) were connected to any legitimate need for an accommodation relieving them from Drake Tower's vaccination requirement. In similar circumstances, the Seventh Circuit has found that an employer's refusal to accept an accommodation did not violate the ADA "for one basic reason: [the plaintiff] never identified any limitation related to her disability that this accommodation would alleviate." *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 493 (7th Cir. 2014); *see also Williams v. Bd. of Educ. of City of Chicago*, 982 F.3d 495, 507 (7th Cir. 2020); *Youngman v. Peoria County*, 947 F.3d 1037, 1042 (7th Cir. 2020) ("The problem . . . is the lack of a causal nexus between [plaintiff's] hypothyroidism and the particular limitation for which he seeks an accommodation. . . . [H]e cites no evidence in the

record to support that necessary causal link.").  In this case, the Kuipers have offered no admissible evidence that a reasonable jury could find actually supports the proposition that their proposed accommodation—exemption from the vaccine—has anything at all to do with their claimed disability—specifically, asthma.  Certainly nothing in former Archbold's exemption letter says this.  Specifically, there is no support for the proposition that the vaccine is contraindicated for persons with asthma.  Archbold seems to claim at one point—without any viable support at all—that the COVID-19 vaccine *causes* asthma (as well as nearly every other adverse condition known to humanity), but there is nothing in his report that says, let alone explains, let alone supports, a contention that the vaccine may exacerbate the condition of persons who have asthma.

In short, plaintiffs have not provided any admissible evidence to support a claim that the vaccine put them at risk.  The closest they get is Archbold's statement that he had read a study in a medical journal that "mention[ed] the risks and that physicians should proceed with caution." Pl.'s Ex. 3 at 112-14.  But even that doesn't support plaintiffs' contentions here.  And, in any event, Archbold's testimony about the medical journal is inadmissible hearsay, as plaintiffs have offered no support for the reliability of the purported reference, let alone for what it says that has anything to do with vaccinating persons with asthma.  *See* Fed. R. Evid. 803(18); *United States v. LeBeau*, 985 F.2d 563 (7th Cir. 1993) ("Rule 803(18) provides that statements contained in learned treatises may be admitted as exceptions to hearsay when the treatise has been 'established as a reliable authority . . . '  Moreover, Rule 803(18) applies only to the extent that the treatise is either relied upon by an expert witness during direct

18

examination or is used to impeach the expert during cross examination.").  In stark

contrast, Drake Tower has offered expert testimony from Dr. Ries, who states that, per

the Centers for Disease Control and the Global Initiative for Asthma, vaccination against

COVID-19 is specifically *recommended* for patients *who have asthma*.  *See* Def.'s Ex. 2

at 4.  The Kuipers have mounted no viable challenge to this evidence.

For these reasons, no reasonable jury could find in favor of the Kuipers on their

claims under the ADA.  Drake Tower is entitled to summary judgment.

**B.    Local Rule 56.1**

In opposing summary judgment, the Kuipers contend that Drake Tower failed to

comply with Northern District of Illinois Local Rule 56.1 by (perhaps among other things)

failing to cite to their statement of material facts in its brief, by including in its statement

of facts contentions for which it does not cite the record, and by including argumentation

in its statement of facts.  The Court is not persuaded that Drake Tower has run afoul of

the Local Rule in any material way.  That aside, "whether to apply the rule strictly or to

overlook any transgression" is "left to the district court's discretion."  *Little v. Cox's*

*Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995).  The Court finds that any potential

violations of Local Rule 56.1 do not rise to the level that would warrant a denial of Drake

Tower's motion for summary judgment on procedural grounds.  In addition, in ruling on

the motion, the Court has relied only on factual material for which there is proper

support in the record.

**Conclusion**

For the following reasons, the Court grants Drake Tower's motion for summary

judgment [dkt. 63] and directs the Clerk to enter judgment stating:  Judgment is entered

19

in favor of defendant and against plaintiffs on all of plaintiffs' claims.

Date: August 6, 2025

MATTHEW F. KENNELLY
United States District Judge